30 F.3d 1138
 24 UCC Rep.Serv.2d 75
 In re BLUE LAKE FOREST PRODUCTS, INC., a California
corporation, Debtor.
The HOOPA VALLEY TRIBE, a federally-recognized Indian Tribe,
on its own behalf and as parens patriae for its
members, Plaintiff-Appellee,
v.
HONGKONG AND SHANGHAI BANKING CORPORATION, LIMITED, a
foreign corporation, Defendant-Appellant,
and
Blue Lake Forest Products, Inc., a California corporation;
Bruce Taylor, Sr., and Susan F. Taylor, Defendants.
 No. 92-16622.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 9, 1994.
Decided July 25, 1994.
 
 William H. Walters, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, for defendant-appellant.
 Thomas P. Schlosser, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.
 PER CURIAM:
 
 
 1
 We decide the extent to which federal limitations on the alienation of Indian trust timber supersede the Uniform Commercial Code.
 
 
 2
 * This dispute, which we review following a grant of summary judgment, is over who gets the proceeds from a sale of logs that the United States originally held in trust for the Hoopa Valley Indian Tribe ("the tribe").
 
 
 3
 Our story begins on June 27, 1990, when the tribe and the United States, as its trustee, concluded a written agreement with Hoopa Forest Industries ("HFI"), a business venture wholly owned by the tribe.[1] The contract (the "Timber Sale Contract") called for the sale of timber from the tribe's Pine Creek L Logging Unit to HFI, SER 3-4, and cross-referenced a set of statutory provisions and regulations--25 U.S.C. Sec. 407 and 25 C.F.R. Sec. 163--which specify that title to Indian timber held in trust by the United States cannot pass until the buyer first pays for it.[2] ER 28, 72.
 
 
 4
 HFI in turn contracted with Blue Lake Forest Products, Inc. ("Blue Lake"), a non-Indian buyer. ER 79-103. Under the HFI-Blue Lake agreement (the "Log Purchase Agreement"), HFI sold the logs to Blue Lake, which planned to turn them into lumber at its off-reservation mill. Id. Blue Lake signed the agreement with knowledge of the Timber Sale Contract, SER 17, and the Log Purchase Agreement incorporated the relevant federal provisions and regulations.[3] ER 79.
 
 
 5
 With this framework in place, HFI delivered approximately 11.6 million board feet of timber to Blue Lake between July 1, 1990, and October 31, 1990. SER 7. Blue Lake, however, failed to pay approximately $950,000 for the September and October deliveries. Id. HFI, in turn, didn't make payments to the tribe under the Timber Sale contract. Blue Lake then filed for bankruptcy, at which time it was holding approximately 1.5 to 2 million board feet of Hoopa Valley logs. Id. The same day, Blue Lake received a notice from the Bureau of Indian Affairs saying the logs hadn't been paid for and demanding that Blue Lake cease any processing.
 
 
 6
 On February 20, 1991, the bankruptcy court issued an order permitting Blue Lake to process and sell the HFI logs, and then deposit the proceeds with the Hongkong and Shanghai Banking Corporation ("the bank"), with the tribe's claim to follow the proceeds. SER 7-8. But the bank had a claim of its own--a security interest in Blue Lake's after-acquired inventory.
 
 
 7
 Which brings us to the dispute before us. Both the tribe and the bank claim the proceeds from the log sale. It's clear, of course, that title to the logs never passed because the buyer (Blue Lake) never paid for them. The tribe says, therefore, that the logs never ceased being its property, and so it--not the bank--is entitled to the money.
 
 
 8
 The bank argues that things are not so simple. Relying on the Uniform Commercial Code, the bank styles itself a good faith purchaser who, under UCC Sec. 2-403, can take good title even when the party purporting to sell the property--here Blue Lake, which gave the bank a security interest--had voidable title. See In re Coast Trading Co., 744 F.2d 686, 690 (9th Cir.1984) ("[A]n initial buyer has full power to convey good title even if it subsequently fails to honor its check or it fails to make the cash payment called for.") (emphasis added).
 
 
 9
 The tribe waives aside these commercial law principles. Rather, the tribe says, we must resolve this dispute under federal law, with particular attention to the heightened protection federal law affords property held in trust for an Indian tribe. This principle, the tribe argues, preempts the application of state commercial law.
 
 
 10
 The district court accepted this argument and granted summary judgment; we review de novo. Jones v. Union Pac. R.R., 968 F.2d 937, 940 (9th Cir.1992).
 
 II
 
 11
 It's clear that federal law affords heightened protection to timber the United States holds in trust for Indian tribes. This is evident in the federal regulations discussed above, which require a special form of contract for alienating trust timber: Timber sales in excess of $10,000 generally can be conducted only pursuant to a contract approved by the Secretary--that is, one that prevents passage of title until payment is made. 25 C.F.R. Sec. 163.12. Moreover, "[e]ssential departures from the fundamental requirements of standard and approved contract forms shall be made only with the approval of the Secretary." Id.
 
 
 12
 But that's not all. In authorizing state courts to adjudicate civil actions arising in "Indian country," see 28 U.S.C. Sec. 1360, Congress specifically prevents state courts from encumbering or alienating tribal assets held in trust, and from promulgating state law rules inconsistent with the federal law on this subject. See 28 U.S.C. Sec. 1360(b).[4] In so doing, Congress emphasized the special nature of the trust relationship between the United States and Indian property, a relationship upon which states are not free to intrude. See Bryan v. Itasca County, 426 U.S. 373, 391, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976).
 
 
 13
 There can be little question, then, that federal law offers heightened protection for property the United States holds in trust for Indian tribes. The question is whether this principle preempts the application of state commercial law in the case before us.[5]
 
 III
 
 14
 "[Q]uestions of pre-emption in [Indian law] are not resolved by reference to standards of pre-emption that have developed in other areas of the law ...," Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 176, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989); see also White Mountain Apache, 448 U.S. at 143, 100 S.Ct. at 2583, at least where the conduct at issue takes place on, rather than off, the reservation.[6] See White Mountain Apache, 448 U.S. at 144, 100 S.Ct. at 2584; cf. Pacific Gas & Elec. Co. v. State Energy Resources Comm'n, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (non-Indian law preemption).
 
 
 15
 Even though this case implicates an off-reservation relationship between two non-Indian actors (Blue Lake and the bank), we deem it an on-reservation case for purposes of preemption because the essential conduct at issue occurred on the reservation: the severance of timber and its removal without proper compensation, in contravention of the governing contract and federal regulations. Furthermore, the Indian enterprise at the heart of this dispute--the timbering lands--is located on, not off, the reservation. Cf. Mescalero, 411 U.S. at 148-49, 93 S.Ct. at 1270-71 (ski resort located off-reservation).
 
 
 16
 When on-reservation conduct involves both Indians and non-Indians,[7] we must undertake "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." White Mountain Apache, 448 U.S. at 145, 100 S.Ct. at 2584; see also Gila River Indian Community v. Waddell, 967 F.2d 1404, 1408 (9th Cir.1992) ("Rather than relying on the normal principles of preemption, the Court has declared that a determination as to whether a state's efforts to regulate non-Indians engaging in on-reservation activity are preempted 'call[s] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake'....") (quoting White Mountain Apache, 448 U.S. at 145, 100 S.Ct. at 2584-85). This makes Indian law preemption broader than traditional preemption: That is, in the Indian law context, state law is preempted not only by an explicit congressional statement--the traditional preemption standard--but also if the balance of federal, state and tribal interests tips in favor of preemption. Id. at 1407-08.
 
 
 17
 In conducting this balancing,[8] we note that federal interests are very extensive and normally prevail over state interests in the regulation of timbering on Indian reservations. See White Mountain Apache, 448 U.S. at 149, 100 S.Ct. at 2586-87 ("[T]he Federal Government has undertaken to regulate the most minute details of timber production...."). Federal regulation of timbering on Indian land is an old and well established practice. See, e.g., United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939); Pine River Logging Co. v. United States, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164 (1902); United States v. Cook, 86 U.S. (19 Wall) 591, 22 L.Ed. 210 (1874). It is also explicitly authorized by Congress, see 25 U.S.C. Sec. 407;[9] United States v. Mitchell, 463 U.S. 206, 209, 103 S.Ct. 2961, 2963-64, 77 L.Ed.2d 580 (1983), and extensive in scope, see, e.g., 25 C.F.R. Sec. 163.[10] Finally, under Mitchell, the United States, as trustee, has a fiduciary obligation to protect, manage and operate Indian lands, including Indian timber.
 
 
 18
 In contrast, state interests are rather meager here. While the state presumably has an interest in seeing its law applied uniformly and in protecting good faith purchasers, that interest is diminished with respect to those dealing with Indian entities or in Indian country. It is too late in the day for someone in the bank's position to claim surprise that federal law, not state law, governs a transaction involving timber harvested on Indian land. Therefore, to the extent there is a conflict between state commercial law and federal laws affording heightened protection to Indian trust timber, the former must give way.
 
 
 19
 Summary judgment was properly granted to the tribe. Title to the logs remained with the United States as the tribe's trustee, and the tribe is entitled to the proceeds from sale of the logs. To the extent state commercial law would yield a different outcome, it is deemed preempted.[11]
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 To be precise, HFI is wholly owned by the Hoopa Valley Development Enterprise, which is wholly owned by the tribe
 
 
 [2]
 In particular, section B2.1 of the Timber Sale Contract Part B Standard Provision states that "title to the timber covered by the contract shall not pass to the Purchaser until it has been scaled, paid for, and removed from the contract area." ER 107 (emphasis added)
 
 
 [3]
 Paragraph 2 of the Log Purchase Agreement reads as follows:
 No provision of this Agreement will be interpreted or enforced in any manner which violates Title 25 U.S.C. Sec. 407, or any other provision of federal law, or the regulations established by the Secretary of the Interior for Indian timber management found in Part 163 of Title 25, Code of Federal Regulations, which laws and regulations are incorporated herein.
 ER 107.
 
 
 [4]
 The text of this provision is as follows:
 (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto....
 28 U.S.C. Sec. 1360(b).
 
 
 [5]
 Preemption is, in fact, just one of "two independent but related barriers to the assertion of state regulatory authority over tribal reservations...." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). The other, tribal self-government, is not at issue here. See id.; see also Dept. of Taxation and Fin. of New York v. Milhelm Attea & Bros., No. 93-377, 1994 WL 249582 (U.S. June 13, 1994) (upholding New York's taxation of wholesale cigarettes sold by suppliers who sell cigarettes to reservations)
 
 
 [6]
 In contrast, where the relevant activities occurred off-reservation, general preemption standards usually do apply. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S.Ct. 1267, 1270-71, 36 L.Ed.2d 114 (1973) (state taxation scheme applied to Indian-owned ski resort located off reservation); Charles F. Wilkinson, American Indians, Time, and the Law 95 (1987). Under these standards, federal law preempts state law in three situations: 1) where federal law does so explicitly; 2) where the federal scheme is so pervasive that Congress must have intended preemption; and 3) where state law would thwart the achievement of Congress's purposes. See Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 603-07, 111 S.Ct. 2476, 2481-82, 115 L.Ed.2d 532 (1991)
 
 
 [7]
 In contrast, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable...." White Mountain Apache, 448 U.S. at 144, 100 S.Ct. at 2584. This principle doesn't govern here because Blue Lake and the bank are not Indian entities
 
 
 [8]
 Our decision stands in contrast to Red Mountain Mach. Co. v. Grace Inv. Co., 29 F.3d 1408 (9th Cir.1994), where we did not have to conduct this balancing because the Secretary of the Interior had determined that use of state law was appropriate. Id. at 1412. Here no such determination has been made
 
 
 [9]
 25 U.S.C. Sec. 407 reads, in pertinent part:
 Under regulations prescribed by the Secretary of the Interior, the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management or to convert the land to a more desirable use.
 
 
 [10]
 The regulations, entitled "General Forest Regulations," reach nearly every aspect of tribal timber operations including approval of advertisement of sales, Sec. 163.8, deposit requirements, Sec. 163.10, acceptance and rejection of bids, Sec. 163.11, required form contracts, Sec. 163.12, bond requirements, Sec. 163.14, acceptable payment terms, Sec. 163.15, and fire management measures, Sec. 163.21
 
 
 [11]
 Because federal law trumps here regardless of what the outcome would be under the UCC, we don't reach whether the bank's interpretation of the UCC is correct