**CABAZON BAND OF MISSION INDIANS; Paul D. Hare, Plaintiffs–Appellants,**

v.

**Larry D. SMITH, Individually and in his capacity as Sheriff of Riverside County; Ronald F. Dye, Individually and in his capacity as Captain, Indio Station, Riverside County Sheriff's Department; County of Riverside, Defendants–Appellees.**

No. 99–55229.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 2000

Submission Deferred May 18, 2000

Resubmitted May 10, 2001

Filed May 17, 2001

Glenn M. Feldman, Mariscal, Weeks, McIntyre, & Friedlander, P.A., Phoenix, Arizona, for the appellants.

Timothy T. Coates, Greines, Martin, Stein & Richland, Beverly Hills, California, for the appellees.

John A. Bryson, Assistant United States Attorney, Washington, D.C., for the amicus curiae.

Before: RYMER and T.G. NELSON, Circuit Judges, and W.D. BROWNING,[1] District Judge.

Opinion by Judge T.G. NELSON; Dissent by Judge W.D. BROWNING

T.G. NELSON, Circuit Judge:

The Cabazon Band of Mission Indians (the "Tribe") appeals the district court's order granting summary judgment to appellees, officials of the Riverside County, California, Sheriff's Department (the "Sheriff"), in the Tribe's suit challenging the application of certain provisions of the California Vehicle Code to tribal police vehicles traveling on public highways located off the reservation. We affirm.

## I.

The essential facts of this case are undisputed. The Cabazon Indian Reservation is located in Southern California. The Tribe has a Public Safety Department which provides law enforcement services on the reservation. Armed and uniformed Cabazon public safety officers drive dark blue vehicles marked on the sides and the rear with the words "Tribal Law Enforcement" and with the name "Cabazon" marked on the sides.

The reservation consists of three non-contiguous parcels of land. Because of physical and geographical barriers, it is not possible to drive between the different parcels without leaving the reservation. Consequently, the Public Safety Department's vehicles must drive on sections of public highways located off the reservation in order to provide law enforcement services to the entire reservation.

Prior to the instant conflict, the public safety vehicles had emergency light bars affixed to their roofs. However, various provisions of the California Vehicle Code limit the use or display of emergency light bars to "authorized emergency vehicles" performing emergency services.[2] Moreover, only such "authorized emergency vehicles" are exempt from certain traffic safety regulations when responding to an emergency.[3] On several occasions before the commencement of this suit, the Sheriff stopped Cabazon public safety officers driving their official vehicles on public highways located off the reservation and cited the officers for displaying emergency light bars, on the ground that the tribal vehicles were not "authorized emergency vehicles" within the meaning of the code.[4] To avoid further conflict, the Tribe's Director of Public Safety ordered the light bars removed. However, the director maintains that operating the public safety vehicles without light bars, or with covered light bars, threatens the safety of his officers and compromises their ability to perform their duties.

The Tribe and its Director of Public Safety, in his official capacity, filed suit in the United States District Court seeking declaratory and injunctive relief against appellees individually and in their capacities as officials of the Riverside County Sheriff's Department. Plaintiffs argued, in the words of the district court, that "Cabazon Public Safety Department vehicles should be treated like those of other law enforcement agencies operating in California."[5] The Tribe sought, *inter alia*, a declaration that the sections of the Califor-

---

1.  The Honorable William D. Browning, United States District Judge for the District of Arizona, sitting by designation.

2.  *See, e.g.,* Cal. Veh.Code §§ 25251(a)(4), 25252, 25258, 25259, 27606.

3.  Cal. Veh.Code § 21055.

4.  Cal. Veh.Code § 165.

5.  *Cabazon Band of Mission Indians v. Smith,* 34 F.Supp.2d 1201, 1204 (C.D.Cal.1998) (*Cabazon II*).

nia Vehicle Code regulating the use of emergency light bars were preempted by the Tribe's sovereign authority to establish and operate a police department to enforce the criminal law on reservation lands and an injunction preventing the Sheriff from interfering with tribal public safety vehicles displaying emergency light bars when they travel between these noncontiguous parcels of reservation land.

The district court found, and the parties do not dispute, that the Cabazon Public Safety Department police vehicles do not fit within California's definition of "authorized emergency vehicles," contained in Section 165 of the Vehicle Code. The court also found that the "state interests in regulating the operation of emergency vehicles are sufficient to overcome whatever interference with tribal [law] enforcement efforts has been caused by precluding the use of light bars," and, as a result, the "general federal policy of supporting tribal law enforcement efforts does not preempt valid state regulation of off-reservation activities in this situation."[6] Finally, it also found that application of the state's vehicle code in this situation did not constitute "an undue or excessive burden on the Tribe's

ability to perform effectively its on-reservation law enforcement functions."[7] As a result, the court denied the Tribe's motion for summary judgment on its claims and entered judgment for the Sheriff. That decision is the subject of the present appeal.[8]

## II.

■ The district court's order granting or denying summary judgment is reviewed *de novo*.[9] Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."[10]

## III.

It may be helpful to begin our discussion of the law applicable to this complex area with a brief statement of what this case does not involve. We are not here dealing with an assertion of state law over Indians who undertake activity on an Indian reservation.[11] Nor is this a case where the state seeks to reach non-Indians who undertake activity on an Indian reservation.[12] Rather, this case involves the issue of whether a state may enforce its vehicle

---

**6.** *Id.* at 1207.

**7.** *Id.* at 1208.

**8.** On cross-motions for summary judgment on the Tribe's first claim for relief, the district court held that Public Law 83–280, codified at 18 U.S.C. § 1162, did not divest the Cabazon Band of its authority "to establish a police force with jurisdiction to enforce tribal criminal law against Indians and to detain and turn over to state or local authorities non-Indians who commit suspected offenses on the reservation." *Cabazon Band of Mission Indians v. Smith*, 34 F.Supp.2d 1195, 1200 (C.D.Cal.1998) (*Cabazon I*). That decision was not appealed and is not at issue before this court.

At our invitation, the United States Department of Justice filed a brief as amicus curiae in support of the Tribe. We acknowledge the

Department's efforts and have fully considered its arguments.

**9.** *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir. 1999).

**10.** Fed.R.Civ.P. 56(c).

**11.** *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

**12.** *See, e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (*Mescalero II*); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

code against tribal police vehicles when they travel on public highways located off the reservation.

▮ The principle governing resolution of this case was announced in *Mescalero Apache Tribe v. Jones (Mescalero I)*.[13] In that case, the Supreme Court stated that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."[14] The Court then applied this principle to uphold New Mexico's rights to collect a nondiscriminatory gross receipts tax from a ski resort owned and operated by the tribe but located off-reservation.[15] In doing so, the Court reasoned that because "tribal activities conducted outside the reservation present different considerations [than those on the reservation]," the "[s]tate's authority over Indians is yet more extensive over activities ... not on any reservation."[16] Furthermore, the *Mescalero I* Court concluded that this principle was not limited to the facts or particular context of the case before it.[17]

The Tribe's claim that sections of the California Vehicle Code regulating the use of emergency light bars are preempted by the Tribe's sovereign authority to establish and operate a police department ignores this principle governing a state's regulatory authority over tribal activities off-reservation. The Tribe does not claim that a specific federal law expressly provides for the preemption of the vehicle code provisions at issue here; instead, it merely points to a number of federal laws that purportedly demonstrate a general federal policy of promoting tribal self-sufficiency and encouraging tribal law enforcement efforts. Thus, because there is no "express federal law to the contrary," and because it is undisputed that California's Vehicle Code is "non-discriminatory state law otherwise applicable to all citizens of the State," the challenged code sections apply to the Tribe's police vehicles when they travel on public highways located off the reservation.

▮ The district court did not rely on *Mescalero I*, but instead invoked the Court's decision in *White Mountain Apache Tribe v. Bracker*[18] for the proposition that "[t]he extent of tribal sovereignty ... clearly involves more than simple geographical limits, but includes the 'tradition of Indian sovereignty over the reservation and tribal members.'"[19] In *White Mountain*, the Court undertook a particularized inquiry into the nature of the state, federal, and tribal interests at stake and held that Arizona's application of its motor carrier license and use fuel taxes to a non-Indian logging company's operation on-reservation was preempted by federal law.[20] Consistent with *White Mountain*'s

---

13. 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

14. *Id.* at 148–49, 93 S.Ct. 1267.

15. *Id.* at 158, 93 S.Ct. 1267 ("It is thus clear that in terms of general power New Mexico retained the right to tax, unless Congress forbade it, all Indian land and Indian activities located or occurring 'outside of an Indian reservation.'").

16. *Id.* at 148, 93 S.Ct. 1267 (internal citation omitted).

17. *Id.* at 149, 93 S.Ct. 1267 ("That principle is as relevant to a State's tax laws as it is to state criminal laws, and applies as much to tribal ski resorts as it does to fishing enterprises." (citation omitted)).

18. 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

19. *Cabazon II*, 34 F.Supp.2d at 1207 (quoting *White Mountain*, 448 U.S. at 143, 100 S.Ct. 2578).

20. 448 U.S. at 145–51, 100 S.Ct. 2578. This preemption analysis "is not dependent on me-

instruction, the district court weighed the competing interests in this case and concluded that the state's interest in regulating the operation of emergency vehicles sufficiently outweighed the federal and tribal interests at stake such that the sections of the California Vehicle Code regulating the use of emergency light bars were not preempted as applied to the Tribe.

However, *White Mountain*'s preemption analysis is not applicable to off-reservation activity.[21] *White Mountain* involved only the on-reservation activity of a non-Indian company.[22] In fact, the *White*

*Mountain* Court expressly recognized the dichotomy between a state's authority to enforce otherwise nondiscriminatory state law off and on-reservation, stating that "[i]n the case of Indians going beyond reservation boundaries, ... a nondiscriminatory state law is generally applicable in the absence of express federal law to the contrary."[23]

The dissent suggests that the *White Mountain* Court intended for its preemption analysis to apply more generally, as "when difficult questions arise concerning the interplay between State law, tribal sovereignty and federal policy concerning self-

chanical or absolute conceptions of state or tribal sovereignty," but rather is "designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145, 100 S.Ct. 2578. That is, in the Indian law context, "state law is preempted not only by an explicit congressional statement ... but also if the balance of federal, state, and tribal interests tips in favor of preemption." *In re Blue Lake Forest Prods.*, 30 F.3d 1138, 1142 (9th Cir.1994).

More recently, in *Mescalero II*, the Court articulated the preemption analysis used in *White Mountain* as follows: "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." 462 U.S. at 334, 103 S.Ct. 2378.

**21.** The district court recognized that in *White Mountain*, the Court stated that there is an independent but related barrier to the assertion of state regulatory authority over tribal reservations and members. Specifically, the exercise of such authority "may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' " *White Mountain*, 448 U.S. at 142, 100 S.Ct. 2578 (quoting *Williams*, 358 U.S. at 220, 79 S.Ct. 269). The district court found that this alternative "tribal self-government" doctrine did not preclude the application of California's Vehicle Code in the present case. The Tribe and the Government only briefly address this issue on appeal and instead dedicate much of their arguments to the applica-

tion of *White Mountain*'s preemption analysis.

In any event, the Tribe cites no case applying to *off-reservation activity* the "tribal self-government" doctrine, nor could we find any. In fact, its origin was in *Williams v. Lee*, where the Court held that state courts had no jurisdiction over a civil claim by a non-Indian against an Indian for a transaction *arising on* the reservation. 358 U.S. at 223, 79 S.Ct. 269. To permit state court jurisdiction in that instance would have "undermine[d] the authority of the tribal courts over Reservation affairs and hence would [have] infringe[d] on the right of the Indians to govern themselves." *Id.* In *Crow Tribe of Indians v. Montana*, 650 F.2d 1104 (1981), we applied *Williams* and its "tribal self-government" doctrine and held the complaint in question stated a claim that certain state taxes infringe on the tribe's right to govern itself. *Id.* at 1117. However, the taxes were only imposed on coal mined by non-Indians from the reservation and from deposits held in trust for the Indians and in no way implicated off-reservation activity. *Id.* at 1107.

**22.** The company asserted that the taxes could not lawfully be imposed on logging activities conducted *exclusively* within the reservation or on hauling activities on Bureau of Indian Affairs and tribal roads *within the reservation*. See *White Mountain*, 448 U.S. at 140, 100 S.Ct. 2578.

**23.** *White Mountain*, 448 U.S. at 144 n. 11, 100 S.Ct. 2578 (internal quotation omitted).

governance of the tribes." However, that proposition is mistakenly derived from the following statement in *White Mountain:*

> When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging. tribal self-government is at its strongest. More difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation. *In such cases* we have .... [conducted] a particularized inquiry into the nature of the state, federal, and tribal interests at stake.... [24]

This passage clearly indicates that the *White Mountain* Court was only addressing the "difficult question" of applying state law to the on-reservation activity of non-Indians when it announced its now famous preemption analysis. In light of this passage and the *White Mountain* Court's recognition of the dichotomy between a state's authority to enforce otherwise nondiscriminatory state law off and on-reservation, there is simply no basis for concluding that *White Mountain*'s preemption analysis can apply to off-reservation activity.

Moreover, Supreme Court authority interpreting *White Mountain* makes clear that *White Mountain*'s preemption analysis-along with its concern for sovereignty factors-does not apply when the issue is whether state law applies off-reservation. In *New Mexico v. Mescalero Apache Tribe* (*Mescalero II*), the state's application of its hunting and fishing laws to nonmembers of the tribe on the reservation was preempted by operation of federal law.[25] The Court stated:

> In [*White Mountain Apache Tribe v.*] *Bracker*, we reviewed our prior decisions concerning tribal and State authority over Indian reservations and extracted certain principles governing the determination whether federal law preempts the assertion of State authority over nonmembers *on a reservation.* We stated that that determination does not depend "on mechanical or absolute conceptions of state or tribal sovereignty, but calls for a particularized inquiry into the nature of the state, federal, and tribal interests at stake."[26]

The *Mescalero II* Court went on to note that, in *White Mountain,* it "emphasized the special sense in which the doctrine of preemption is applied *in this context*"[27] and that "[b]y resting preemption analysis principally on a consideration of the nature of the competing interests at stake, our cases .... have rejected the proposition that preemption requires 'an express congressional statement to that effect.'"[28] However, at the same time, the *Mescalero II* Court noted that "[o]ur cases have recognized that tribal sovereignty contains a 'significant geographical component,'"[29] and, as a result, "the off-reservation activities of Indians are generally subject to the prescriptions of a 'nondiscriminatory state law' in the absence of 'express federal law to the contrary.'"[30] This statement, ap-

---

24. *Id.* at 144–45, 100 S.Ct. 2578 (emphasis added).

25. 462 U.S. 324, 343–44, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).

26. *Id.* at 333, 103 S.Ct. 2378 (emphasis added).

27. *Id.* (emphasis added).

28. *Id.* at 334, 103 S.Ct. 2378 (quoting *White Mountain,* 448 U.S. at 144, 100 S.Ct. 2578).

29. *Id.* at 335 n. 18, 103 S.Ct. 2378 (quoting *White Mountain,* 448 U.S. at 151, 100 S.Ct. 2578).

30. *Id.* (quoting *Mescalero I,* 411 U.S. at 148–49, 93 S.Ct. 1267).

pearing after the Court rejected the requirement for an "express congressional statement" when applying *White Mountain*'s preemption analysis, confirms that *White Mountain*'s preemption analysis does not apply when the issue is whether state law applies off-reservation.[31]

*Salt River Pima–Maricopa Indian Cmty. v. Yavapai County*[32] buttresses this conclusion. In that case, we applied *Mescalero I* to uphold Arizona's imposition of its property tax on a tribe's commercial property located off the reservation.[33] In doing so, we did not discuss any sovereignty considerations, nor did we undertake a particularized inquiry into the nature of the state, federal, and tribal interests at stake; instead, we only addressed whether imposition of the tax was discriminatory.[34]

The Tribe's reliance on *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*[35] is misplaced. *Kiowa Tribe* concerned whether a tribe's sovereign immunity barred a civil suit against the tribe in state court, where the activity giving rise to the suit occurred off the reservation.[36]

In holding that immunity did bar the suit, the Supreme Court clearly indicated that its decision did not erode the principle that generally applicable laws apply to Indians off-reservation.[37] The Court explained: "To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit.... There is a difference between the right to demand compliance with state laws and the means available to enforce them."[38]

For its part, the Government, as amicus, points to our decision in *In re Blue Lake Forest Products, Inc.*,[39] as support for the position that this case is not governed by *Mescalero I*, but rather must be decided under *White Mountain*'s preemption analysis. *Blue Lake* involved a dispute between a tribe and a bank over the proceeds of the tribe's sale to Blue Lake, a non-Indian commercial company located off the reservation, of logs harvested from tribal lands. Blue Lake gave the bank a security interest in its after-acquired property, failed to pay for the logs, and went

---

**31.** Citing *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176–77, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) and *Ramah Navajo School Board, Inc. v. Bureau of Revenue*, 458 U.S. 832, 838, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the dissent argues that since *White Mountain*, the Court "has continued to reiterate the more flexible analysis used in that case, without any particular emphasis on it only applying ... in situations occurring on reservations." However, in both cases cited, the Court framed the issue as concerning the on-reservation activity of non-Indians, *see Cotton Petroleum Corp.*, 490 U.S. at 166, 173, 175, 109 S.Ct. 1698 (state cannot apply its severance taxes to a non-Indian lessee's oil and gas production from reservation lands); *Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 834, 844, 102 S.Ct. 3394 (state cannot justify "a tax imposed on the construction of school facilities *on tribal lands* " (emphasis in original)), and it was clear in both cases that state law was not applied to off-reservation activity.

**32.** 50 F.3d 739 (1995).

**33.** *Id.* at 740–41.

**34.** *See id.*

**35.** 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

**36.** *Id.* at 753–54, 118 S.Ct. 1700.

**37.** *Id.* at 755, 118 S.Ct. 1700 (stating that "[o]ur cases allowing States to apply their substantive laws to tribal activities are not to the contrary").

**38.** *Id.* Likewise, the Tribe's reliance on *Queets Band of Indians v. Washington*, 765 F.2d 1399 (9th Cir.1985), is also unavailing. The decision in *Queets Band* was vacated at the request of the parties, 783 F.2d 154 (9th Cir. 1986), and therefore provides no support for the Tribe's argument.

**39.** 30 F.3d 1138 (9th Cir.1994).

bankrupt. The bankruptcy court authorized Blue Lake to process and sell the logs and then deposit the proceeds with the bank. The tribe claimed the proceeds under a federal statute which specified that title to Indian timber held in trust by the United States cannot pass until the buyer first pays for it, and the bank claimed the proceeds under state commercial law.[40] We concluded that the relevant tribal activity occurred on-reservation:

> Even though this case implicates an off-reservation relationship between two non-Indian actors (Blue Lake and the bank), we deem it an on-reservation case for purposes of preemption because the essential conduct at issue occurred on the reservation: the severance of timber and its removal without proper compensation, in contravention of the governing contract and federal regulations. Furthermore, the Indian enterprise at the heart of this dispute-the timbering lands-is located on, not off, the reservation.[41]

Contrary to the Government's argument, *Blue Lake* does not stand for the proposition that, in certain limited instances, tribal activities occurring off-reservation may be deemed to occur on-reservation for purposes of applying *White Mountain*'s preemption analysis. *Blue Lake* merely stands for the proposition that, when determining whether to apply *White Mountain*'s preemption analysis, a court should focus on the location of the tribal activity which gave rise to the dispute over application of state law, even if that dispute also involves an off-reservation relationship between non-Indian actors. Here, unlike in *Blue Lake*, the Tribe's activity that gave rise to this dispute over application of certain sections of the California Vehicle Code occurred off-reservation. Thus, nothing in *Blue Lake* requires us to reach a different result here.

Finally, the dissent argues that even if we apply the principle announced in *Mescalero I*, the sections of the California Vehicle Code regulating the use of emergency light bars could not be applied to the Tribe's police vehicles because doing so would discriminate against the Tribe. It cites our decision in *Salt River Pima–Maricopa Indian Community*, which held that Arizona's tax on a tribe's commercial property located off the reservation was not discriminatory because the tribe was "similarly situated" with Arizona's sister states whose property in Arizona was not exempt from taxation.[42] According to the dissent, because law enforcement vehicles from border states can operate inside California within 50 miles of the border, light bars intact,[43] the Tribe must also be permitted to display emergency light bars when it drives its police vehicles on public highways between its three noncontiguous parcels of land.

In *Salt River*, we applied the well-established rule that "[a] tax is discriminatory if it is not imposed equally upon similarly situated groups."[44] In doing so, we could not have intended to make the "similarly situated" rule applicable in every case which requires us to decide whether a tribe is "subject to non-discriminatory

---

**40.** *Blue Lake,* 30 F.3d at 1140.

**41.** *Id.* at 1141.

**42.** 50 F.3d at 740–41.

**43.** *See* Cal.Penal Code § 830.39.

**44.** 50 F.3d at 740 (relying on *First Fed. S & L v. Massachusetts Tax Comm'n,* 437 U.S. 255, 260–62, 98 S.Ct. 2333, 57 L.Ed.2d 187 (1978) (applying "similarly situated" test to determine whether state tax is discriminatory) and *United States v. County of Fresno,* 429 U.S. 452, 462, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977) (same)).

state law otherwise applicable to all citizens of the State."[45] The "similarly situated" rule is not appropriate in all such cases, and it is certainly not appropriate in this case, where it is undisputed that the challenged vehicle code sections apply, with limited exceptions, to all individuals and entities within California.[46]

That California permits law enforcement vehicles from its sister states to drive on its highways while displaying emergency light bars does not make enforcement of these code sections against the Tribe discriminatory. "[T]ribal reservations are not States,"[47] and the decision whether to grant the Tribe the same status as these other states rests with the legislature. While there may be policy arguments in favor of permitting the Tribe to display emergency light bars when it drives its police vehicles on public highways between its three noncontiguous parcels of land, it is inappropriate for us to substitute our judgment for that of the state's elected representatives.[48] We simply cannot accept the argument that exceptions to a law of general applicability automatically make that law discriminatory when applied to someone else.

## IV.

Supreme Court authority instructs that the principle governing the instant case is as follows: "Absent express federal law to the contrary, Indians going beyond reservation boundaries [are] generally ... subject to non-discriminatory state law otherwise applicable to all citizens of the State."[49] Here, because there is no "express federal law to the contrary," and because it is undisputed that California's Vehicle Code is "non-discriminatory state law otherwise applicable to all citizens of the State," the challenged code sections apply to the Tribe's police vehicles when they travel on public highways located off the reservation.

AFFIRMED.

W.D. BROWNING, District Judge, dissenting:

I respectfully dissent.

## I.

The Cabazon Indian Reservation is located in Southern California, but because of the vagaries of geography and history, is not contiguous. Rather, it is divided into four different sections, which requires

---

**45.** *Mescalero I*, 411 U.S. at 149, 93 S.Ct. 1267.

**46.** The dissent suggests that our conclusion, that the "similarly situated" rule does not apply because the case before us is not a tax case, undermines our reliance on *Mescalero I*. See *infra* at n. 16. In other words, because *Mescalero I* involved the imposition of taxes on a ski resort, it should have no impact on a case which involves essential government functions like public safety. However, the *Mescalero I* Court emphasized that the principle it was announcing (that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State") was not limited to the facts or particular context of the case before it. Moreover, that this principle is not limited to a particular context is not inconsistent with the conclusion that, when determining whether a state law is in fact discriminatory, we should consider the context in which that law is applied.

**47.** *White Mountain*, 448 U.S. at 143, 100 S.Ct. 2578.

**48.** Likewise, enforcement of these code sections against the Tribe is not discriminatory merely because the legislature has also decided to make an exception for the Washoe Tribe.

**49.** *Mescalero I*, 411 U.S. at 148–49, 93 S.Ct. 1267.

one to travel on either state and county maintained roads or Interstate 10 to get from one section to another.

On several occasions before the commencement of this suit, the Riverside County Sheriff stopped Cabazon Tribal Police, driving in official vehicles on public highways, and cited the officers for displaying emergency light bars. In one instance, the Tribal officer was on his way to a situation in another part of the reservation in which an individual died. Because of the continued enforcement against the Tribal police by the Sheriff's department, the Tribe's Director of Public Safety first ordered the light bars covered when off-reservation, then removed because of problems with covering the lights. The director maintains that operating the public safety vehicles without light bars, or with covered light bars, threatens the safety of his officers and comprises their ability to perform their duties.

## II.

### A. Applicable Law

The appellees have suggested that this is a case dependent on the issue of whether a state may enforce its vehicle code against tribal members when they travel on public highways located off the reservation. For the proposition that the state law is enforceable against the Tribe without consideration of tribal interests, they rely on *Mescalero Apache Tribe v. Jones* (*Mescalero I*).[1] In *Mescalero I* the Supreme Court stated "[a]bsent express federal law to the contrary, Indians *going beyond reservation boundaries* have generally been held subject to non discriminatory state law otherwise applicable to all

citizens of the State."[2] The Court applied this principle to uphold New Mexico's right to collect a nondiscriminatory gross receipts tax from a ski resort owned and operated by the tribe but located off the reservation.[3]

The issue in this case is more complex than that stated by Appellees. The Tribe's police cars are equipped with light bars, like those of almost every jurisdiction's police force. Light bars are useful, even necessary, in the Tribe's pursuit of law and order on its reservation. However, in order to fulfill its duties to the members of its tribe, the tribal police must incidentally and occasionally use state and federal highways patrolled by Riverside County. Thus, the Tribal police's "infringement" on the state's ability to regulate the use of light bars on its roads is both limited and necessary to accomplish the Tribe's federally mandated duties to provide police services to its members.

Moreover, unlike the cases cited by the appellees and the majority, the case before us concerns an essential government function—public safety—rather than merely fiscal matters such as the imposition of state taxes which do not implicate threats to life and limb.

The district court appears to have recognized this complexity and did not rely on *Mescalero I*, but instead invoked the Court's later decision in *White Mountain Apache Tribe v. Bracker*,[4] for the proposition that "[t]he extent of tribal sovereignty . . . clearly involves more than simple geographical limits, but includes the 'tradition of Indian sovereignty over the reservation and tribal members.' "[5]

---

1. 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

2. *Id.* at 148–49, 93 S.Ct. 1267 (emphasis added).

3. *Id.* at 158, 93 S.Ct. 1267.

4. 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

5. *Cabazon II*, 34 F.Supp.2d at 1207.

Appellees and the majority suggest, however, that the application of *White Mountain Apache v. Bracker* was incorrect, because the preemption analysis used in that case is only applicable in situations that occur on the reservation. The Supreme Court stated in a footnote to *White Mountain Apache*, that "[i]n the case of 'Indians going beyond reservation boundaries,' however, 'a nondiscriminatory state law' is generally applicable in the absence of 'express federal law to the contrary.'"[6] However, since the decision on *White Mountain Apache v. Bracker* in 1980, the Court has continued to reiterate the more flexible analysis used in that case, without any particular emphasis on it applying only in situations occurring on reservations.[7] Particularly instructive is the Court's statement that when difficult questions arise concerning the interplay between State law, tribal sovereignty and federal policy concerning self-governance of the tribes, the inquiry should not be dependent on mechanical or absolute conceptions of state or tribal sovereignty, but calls for a particularized inquiry into the nature of the state, federal and tribal interests at stake, to determine, whether in that particular context, the exercise of state authority would violate federal law.[8] Even the Court in *Mescalero Apache Tribe v. Jones* recognized that the off-reservation application of non-discriminatory state law was only a generality and not carved in stone on Mt. Sinai.[9] This is particularly true in this case, where the Tribe's ability to police its own members on the reservation is affected by State laws that affect *de minimus* conduct off the reservation.

The appropriate application of this analysis is evident in *Queets Band of Indians v. State of Washington.*[10] *Queets*, although vacated by this court, is well reasoned and a proper statement of the law after a complete review of the applicable Supreme Court cases. *Queets* is instructive and persuasive, although the vacation of the opinion does not allow us to rely on it as controlling. It was vacated at the request of the parties to accommodate a legislative resolution, not because it was defective. Since the Court has never renounced the result or rationale of *Queets* on substantive legal grounds we should accept the vacated opinion as solidly reasoned and formally embrace it as of precedential value.

The Queets, a federally recognized tribe, had asked the state of Washington to provide license plates for tribal vehicles at the nominal fee charged to state agencies and local governments. The state refused, and so the Tribe adopted its own licensing and registration system for tribal vehicles engaged in government services. Although the Tribe made allowances for reciprocity with other jurisdictions, the State did not consider the Tribe to be a jurisdiction entitled to reciprocity under its statutes and cited tribal vehicles, traveling on state patrolled highways within the reservation, for being improperly licensed.

**6.** *White Mountain Apache v. Bracker*, 448 U.S. at 144, n. 11, 100 S.Ct. 2578, *citing Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

**7.** *See Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333–34, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *Cotton Petroleum v. New Mexico*, 490 U.S. 163, 176–77, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989).

**8.** *White Mountain Apache v. Bracker*, 448 U.S. at 144–45, 100 S.Ct. 2578.

**9.** 411 U.S. at 148–49, 93 S.Ct. 1267.

**10.** 765 F.2d 1399 (9th Cir.1985), *vacated as moot*, 783 F.2d 154 (1986).

As a starting point for its analysis the court determined that the tribe had the inherent authority to register tribal vehicles and issue tribal license plates for their government vehicles. The court held the Tribe's licensing and registering of their tribal vehicles carried with it "sufficient preemptive force to require that the state of Washington afford reciprocal recognition."[11] This decision was an accommodation of the interests of the Tribe and federal government in promoting self-government and sovereignty and those of the State.[12] Likewise, here the balance between the State's interest in regulating the use of light bars on emergency vehicles is preempted by the Tribe's interest in maintaining an effective police force on its reservation.

## B. The State's Interest

Although the State allows public and privately-owned ambulances, forestry and fire department vehicles, vehicles owned by the state or bridge and highway districts, vehicles owned and operated by any department or agency of the federal government, and even tribal fire department vehicles to be equipped with light bars, it has argued that allowing the tribal police to travel the fourteen miles between different areas of the reservation with uncovered light bars would disrupt traffic. In particular the State has stated that the sight of tribal police vehicles with light bars would disrupt traffic by suggesting to motorists that they ought to slow down.

The State does not explain why vehicles from other jurisdictions, such as Los Angeles County, or private security vehicles would not have the same effect and why it is necessary to single out tribal vehicles for this prohibition.

Accordingly, the State's argument appears at best to be specious and pretextual. At worst, it is discriminatory. To claim only Cabazon light bars are distractive and dangerous—while others are not—is disingenuous and must be rejected. The State has made no allegation that the Tribe is guilty of misuse of light bars, or guilty of any other misconduct that would warrant it being treated differently. Furthermore, the State has already made an exception for the Washoe tribe that appears to negate any argument that Tribal vehicles are inherently disruptive to flow of traffic on California highways.[13]

## C. The Tribe's Interest

In contrast, the Tribe's interest is compelling. The Tribe asserts that the inability of its police to have and operate emergency light bars on its vehicles while traveling between different sections of its reservation interferes with its efforts to police the reservation. As noted by the director of public safety for the Tribe, "[e]mergency lights play an important role both in safely responding to emergency situations and from a community relations standpoint in confirming the officers' status as law enforcement officials with those individuals that the officers

11. *Id.* at 1408.

12. *Id.*

13. The legislative history of the Washoe statute, Cal.Penal Code § 830.8(e), shows very clearly that the part thereof that authorizes the use of light bars is merely ancillary to the tribal officers' jurisdiction. The history shows that the use of light bars was not debated or commented on at any time in the legislative process, thus we may infer that no

one had to overcome the concern that light bars would be "distracting or dangerous." The Washoe legislation provides for emergency vehicle use off reservation ("going" to or from "tribal lands"). The California legislature wouldn't have legislatively condoned this use if it were a threat to public safety, nor should we. It is merely an obvious and necessary adjunct to the tribal exercise of jurisdiction, given the "unique geographical problem" present in the Washoe reservation and here.

come in contact with on a day-to-day basis."

The district court found that the application of the State's laws concerning light bars has interfered with the Tribe's law enforcement activities and that the requirement that police vehicles cover their light bars when leaving the reservation did not constitute a substantial imposition on the Tribe's right to self-government and tribal law enforcement.[14] I disagree. In the record is at least one incident in which the County Sheriff's enforcement of the statute concerning light bars delayed an officer responding to a life threatening situation. Common sense convinces me that requiring tribal officers to stop, cover their light bars before leaving the reservation, then stop again to uncover them when reentering the reservation cannot be conducive to quick response to emergencies.

More importantly, if light bars are not essential equipment for effective law enforcement and emergency services, then neither would the Riverside Sheriff be using them, nor would there be so many entities permitted to use them under the statute. Accordingly, I would find that the Tribe's interests in supporting an effective and efficient public safety and law enforcement program preempts the State's interests in preventing motorists from slowing down when a tribal officer appears in their rear-view mirror.

### D. Non–Discriminatory State Law Applied to Tribal Actions Off Reservation

Even under the standard suggested by *Mescalero Apache Tribe* ("absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law"), the State statute should not be applied to the Tribe's police force. This court has held, in an analogous situation, that a law applied to an Indian tribe is discriminatory if it is not imposed equally upon similarly situated groups.[15] Determining whether a tax imposed on the tribe for off-reservation activities was discriminatory, the court concluded that the Pima–Maricopa Community was similarly situated with Arizona's sister states and their cities and counties.[16] Those entities were not exempt from taxation of their business activities in Arizona, and, thus, the court decided that the Community was also not exempt.[17]

However, here it is obvious that the Tribe and its public safety department has not been treated like similarly situated political entities and law enforcement bureaus. Not only are all state, county and city law enforcement agencies permitted to use light bars on their vehicles, but law enforcement services from Oregon, Nevada, and Arizona are permitted to enter California, light bars intact, within 50 miles of the border in the pursuit of their duties.[18] Moreover, law enforcement officers of the Washoe Tribe, whose tribal lands cover territory in both California and Nevada, are specifically permitted to travel to and from Washoe tribal lands within California in order to carry out tribal duties, even if that travel requires using non-tribal rights-of-way.[19]

14. *Cabazon II*, 34 F.Supp.2d at 1207.

15. *Salt River Pima–Maricopa Indian Community v. Yavapai County*, 50 F.3d 739, 740 (9th Cir.1995). The majority has argued that this case is inapposite because of its tax context. However, that argument is equally applicable to the *Mescalero* cases.

16. *Id.*

17. *Id.* at 741–42.

18. *See* Cal.Penal Code § 830.39.

19. *See* Cal.Penal Code § 830.8(e)

By contrast, the Tribe, whose jurisdiction is completely within the territorial boundaries of the State and is who is fulfilling its sovereign duty to protect and serve its members, has not been accorded the courtesy of traveling the approximately fourteen miles between the various segments of its reservation. The Tribe has not requested the ability to use its light bars off the reservation or to be exempt from the traffic laws when traveling on state roads, nor has it requested the ability to carry out its law enforcement functions off the reservation. Given that the Tribe's "intrusion" onto the State's roadways is minimal compared to that of sister states and jurisdictions, the limitations placed by the State are not "nondiscriminatory" as applied to the Tribe.