**PRAIRIE BAND POTAWATOMI NATION, Plaintiff–Appellee,**

v.

**Joan WAGNON, Secretary of Revenue, State of Kansas; Sheila Walker, Director of Vehicles, State of Kansas; and William Seck, Superintendent, Kansas Highway Patrol, State of Kansas, in their official capacities, Defendants–Appellants.**

No. 03–3322.

United States Court of Appeals, Tenth Circuit.

March 25, 2005.

Brian R. Johnson, Special Assistant Attorney General, Law Offices of John M. Knox, Chartered, Lawrence, KS, for Defendants–Appellants.

David Prager, III, Tribal Attorney, Prairie Band Potawatomi Nation, Mayetta, KS, for Plaintiff–Appellee.

Before McCONNELL and McKAY, Circuit Judges, and FRIOT, District Judge.*

McKAY, Circuit Judge.

Plaintiff Prairie Band of Potawatomi Indians ("the Tribe"), a federally recognized Kansas Indian tribe, filed this action against Kansas state officials seeking to have its motor vehicle registrations and titles recognized by the State. The district court granted a preliminary injunction in favor of Plaintiff, affirmed by this court on June 25, 2001, prohibiting enforcement of the State motor vehicle registration and titling laws with respect to

---

* The Honorable Stephen P. Friot, United States District Judge for the Western District of Oklahoma, sitting by designation.

vehicles registered and titled by the Tribe. *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234 (2001) (*"Prairie Band I"*). On August 6, 2003, following the outline and guidance provided by this court in *Prairie Band I,* the district court granted Plaintiff's motion for summary judgment, permanently enjoining Defendants from further application and enforcement of Kansas' motor vehicle and titling laws against Plaintiff and any persons who operate or own a vehicle properly registered and titled pursuant to tribal law. On October 8, 2003, the district court denied Defendants' motion to reconsider. Defendants appeal to this court.

The district court opinions and our opinion in *Prairie Band I* provide a comprehensive history of the dispute which will not be repeated in detail here. The relevant facts are as follows. On March 16, 1999, in order to address the increase in motor vehicle traffic on the reservation, the Tribe enacted the Prairie Band Motor Vehicle Code ("PBMVC") to "implement reasonable rules, regulations, and penalties essential to maintaining a safe and efficient transportation system" on the reservation.

Aple. Supp.App., Vol. I, at 8 (PBMVC Ch. 17–1). Pursuant to the PBMVC, tribal registrations and titles are required for all vehicles owned by Tribe members who reside on the reservation and for all tribal government vehicles. *Id.* at 56 (PBMVC Ch. 17–10–1(B)). The PBMVC requires those seeking tribal registrations to surrender any certificate of title issued by another jurisdiction, including Kansas. The tribal certificates of title are of banknote quality and resemble titles of other jurisdictions, and the license plates conform to the national standards for visibility, design, and size. *Id.* at 80

Prior to the enactment of the PBMVC, the Tribe's members complied with Kansas' motor vehicle code which requires that all vehicles that operate in Kansas be registered and titled by the State. *See* Kan. Stat. Ann. § 8–142 (2001).[1] Nonresidents who operate vehicles in Kansas are not considered violators if they are properly registered and titled in the state of their residence provided that their state grants reciprocal recognition to Kansas' registrations and titles. *See* Kan. Stat. Ann. § 8–138a (2001).[2]

1. Section 8–142 provides in pertinent part:

It shall be unlawful for any person to commit any of the following acts and except as otherwise provided, violation is subject to penalties provided in K.S.A. 8–149, and amendments thereto:

*First:* To operate, or for the owner thereof knowingly to permit the operation, upon a highway of any vehicle, as defined in K.S.A. 8–126, and amendments thereto, which is not registered, or for which a certificate of title has not been issued or which does not have attached thereto and displayed thereon the license plate or plates assigned thereto by the division for the current registration year, including any registration decal required to be affixed to any such license plate pursuant to K.S.A. 8–134, and amendments thereto, subject to the exemptions allowed in K.S.A. 8–135, 8–198[,] and 8–1751a, and amendments thereto.

*Second:* To display or cause or permit to be displayed, or to have in possession, any registration receipt, certificate of title, registration license plate, registration decal, accessible parking placard or accessible parking identification card knowing the same to be fictitious or to have been canceled, revoked, suspended or altered.

Kan. Stat. Ann. § 8–142 (2001).

2. Section 8–138a states:

The provisions of this section shall apply only to the nonresident owner or owners of any motor vehicle constructed and operated primarily for the transportation of the driver or the driver and one or more nonpaying passengers. Such nonresident owners, when duly licensed in the state of residence, are hereby granted the privilege of operation of any such vehicle within this state to the extent that reciprocal privileges are

At this point, three vehicles have been issued tribal registrations and titles. Aple. Supp.App., Vol. I, at 81. Approximately 300–400 vehicles will be titled under the PBMVC if the system is allowed to proceed. Plaintiff submits that it is necessary for privately and tribally owned vehicles to occasionally leave the reservation for various reasons. *Id.* at 81. In the absence of an injunction, it is Defendants' position that drivers of tribally licensed vehicles will be in violation of Kansas state law for failure to present a properly registered vehicle.[3] Because Kansas does not recognize registrations and titles issued by the Tribe as valid, prior to this litigation and the issuance of the preliminary injunction three citations were issued by the State for persons driving tribally registered vehicles off the reservation.

The issues on appeal are whether the district court: (1) abused its discretion in issuing the permanent injunction; (2) erred in its ruling that defendants were not entitled to sovereign immunity; and (3) erred in ruling that the relief requested by the Tribe (a permanent injunction) did not violate the Tenth Amendment. Plaintiff argues that, in light of our decision in *Prairie Band I* affirming the district court's grant of a preliminary injunction, certain issues should not be readdressed based on the law of the case doctrine.

The law of the case doctrine sets forth the fairly straightforward legal and pragmatic principle of certainty throughout the proceedings of a case: "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). However, courts are quick to recognize the flexibility of the rule and are permitted to overturn erroneous rulings as the underlying policy of the rule is one of efficiency, *Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981) (citations omitted), not restraint of judicial power, *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). Indeed, the presence of new evidence or subsequent contradictory precedent or a determination that the previous ruling was clearly erroneous are legitimate bases for not applying the law of the case doctrine. *Major,* 647 F.2d at 112.

Relying on the law of the case doctrine, Plaintiff delineates the following issues as ones that we need not reconsider: (1) whether we have subject matter jurisdiction over the instant action; (2) whether Plaintiff has standing; (3) whether an Article III case or controversy exists; and (4) whether the balancing test outlined in *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), must be applied to this case. Aple. Br. at 15–16. Neither the order granting Plaintiff's motion for summary judgment nor Defendant's appeal therefrom specifically addresses the first three issues Plaintiff alleges fall under the

---

granted to residents of this state by the state of residence of such nonresident owner. Kan. Stat. Ann. § 8–138a (2001). As we noted in *Prairie Band I,* section 8–138a requires recognition of registrations and titles issued by Indian tribes that reside outside the State of Kansas. 253 F.3d at 1238 n. 2 (citing *State v. Wakole,* 265 Kan. 53, 959 P.2d 882, 885–86 (1998), for the proposition that since the State of Oklahoma recognized an Oklahoma tribe's

license plates as valid for use on Oklahoma highways, a vehicle with the Oklahoma tribe's license plate was "duly licensed" pursuant to Kan. Stat. Ann. § 8–138a).

3. Defendants have taken the position that since the Tribe is within the State of Kansas, the reciprocal-privileges exception in section 8–138a does not apply to the Tribe because Tribe members are not non-residents.

law of the case doctrine.[4]

 We review *de novo* a district court's grant of summary judgment, applying the same legal standard employed by the district court, to determine whether there is a genuine issue as to any material fact and whether a party is entitled to judgment as a matter of law. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001); *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 583 (10th Cir.2000). The first issue on appeal is whether the district court abused its discretion in issuing the permanent injunction. *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir.1993) ("[W]e review the district court's grant or denial of a permanent injunction for an abuse of discretion."). A district court abuses its discretion when it issues an "arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir.1999) (citation omitted).

 For a party to obtain a permanent injunction, it must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir.2003) (citations omitted). This standard is remarkably similar to the standard for a preliminary injunction. The only measurable difference between the two is the requirement of actual success on the merits. (For a preliminary injunction, only a substantial likelihood of success on the merits must be established.) *See Prairie Band I*, 253 F.3d at 1246 (citing *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1194 (10th Cir.1999)). Because we already considered and determined in *Prairie Band I* that the Tribe will suffer irreparable harm if the injunction is not issued, that the balance of the harms favors the Tribe, and that the granting of the injunction will not adversely affect the public interest, it follows that the only real controversy which this Court must decide is whether the district court abused its discretion in ruling that the Tribe has succeeded on the merits.[5]

 This dispute involves federal preemption. Specifically, "[t]he issue present-

---

**4.** The District Court Order does mention that, to the extent Defendants are attempting to argue that there is no Article III case or controversy, that issue was already "decided by the Tenth Circuit." Aplt. Am.App., Vol. IV, at 1014–15 (District Court Order, August 6, 2003); *Prairie Band I*, 253 F.3d at 1240–42. Defendants do not address this point in their brief. Defendants also do not specifically argue on appeal that our holding in *Prairie Band I* that the Tribe has standing was incorrect. In *Prairie Band I*, we stated that "[t]he state's refusal to extend recognition, therefore, causes an obvious harm to the tribe: interference with or infringement on tribal self-government." 253 F.3d at 1242; Aplt. Am.App., Vol. IV, at 1015 (District Court Order, August 6, 2003). Defendants do make a conflated Eleventh Amendment sovereign immunity argument that confuses several of these issues with the *Ex parte Young* exception. We address that issue later in this opinion.

**5.** Defendants made a bald claim on appeal that the second, third, and fourth permanent injunction factors were applied incorrectly by the district court, *see* Aplt. Br. at 8, but provided no argument in support of this assertion. We will not craft a party's argument for him on appeal. *United States v. Graham*, 305 F.3d 1094, 1107 (10th Cir.2002); *see also Perry v. Woodward*, 199 F.3d 1126, 1141 n. 13 (10th Cir.1999); *Brownlee v. Lear Siegler Mgmt. Servs. Corp.*, 15 F.3d 976, 977–78 (10th Cir.1994); *Primas v. City of Okla. City*, 958 F.2d 1506, 1511 (10th Cir.1992); *American Airlines v. Christensen*, 967 F.2d 410, 415 n. 8 (10th Cir.1992).

ed in this case ... is whether the doctrines of federal preemption and Indian sovereignty act as barriers to the State's exercise of its regulatory power to title and register vehicles belonging to either the [Tribe] or its members who reside on the reservation." *Prairie Band of Potawatomi Indians v. Wagnon,* 276 F.Supp.2d 1168, 1184 (D.Kan.2003). It is not, as Defendants assert, whether the Tribe "has the power to regulate the activities of state officials enforcing state law off reservation." Aplt. Br. at 13. It is not "whether [the Tribe] can 'order' state officials not to issue citations to tribally registered vehicles." *Prairie Band of Potawatomi Indians v. Richards,* No. 99–4136–DES, 2002 WL 215996, at *3 (D.Kan. Feb. 8, 2002); Aplt. Am.App., Vol. I, at 167. It is not whether "State law[s] off reservation [are] subservient to tribal ordinances." Aplt. Br. at 12. Instead, "[t]he real issue is whether defendants' actions interfere with plaintiff's sovereignty or ability to self-govern to the extent that the State's actions must be preempted *by federal law,* when some of defendants' actions may occur off the reservation." Aplt. Am.App., Vol. IV, at 1018 n. 78 (emphasis added). Defendants' attempt to recharacterize the dispute as one of tribal control over the State is misguided and improperly confuses the issue before the court.

Most of Defendants' brief rehashes arguments that were presented to and rejected by this court in *Prairie Band I.* In *Prairie Band I,* we provided the district court with the appropriate legal framework within which to view this case. Following our direction, the district court correctly recognized that in order for the Tribe to succeed on the merits of its claims it had to "demonstrate that the state laws at issue [were] preempted by federal law or that the doctrine of Indian sovereignty in conjunction with federal preemption bars the State from enforcing its title and registration laws, as they apply to plaintiff." Aplt. Am.App., Vol. IV, at 1020 (District Court Opinion, August 6, 2003). The district court then applied the *Bracker* balancing test in evaluating the respective federal, state, and tribal interests. 448 U.S. at 151, 100 S.Ct. 2578; Aplt. Am.App., Vol. IV, at 1021 n. 93. The district court's analysis is not only thoughtful but it also adequately and properly addresses all of the arguments raised by Defendants in this appeal.

Defendants' main argument on appeal is that the district court improperly applied the *Bracker* balancing test because the tribal titling and licensing inherently implicates off-reservation interests when Tribe members drive off the reservation onto State roads. Defendants do not dispute that the Tribe has jurisdiction to register and title tribal vehicles; however, once the tribally registered vehicles leave the reservation, Defendants contend that Kansas can choose not to recognize these vehicles as validly registered and titled pursuant to State law. This is a difficult case because of the transitory nature of motor vehicles. No one disputes the Tribe's authority to apply the PBMVC on reservation land; the dispute arises solely because the tribally tagged vehicles must sometimes leave the reservation and drive on Kansas' roads.

Defendants cite to *Mescalero Apache Tribe v. Jones* for the principle that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." Aplt. Br. at 22 (quoting 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)). As noted above, we squarely addressed this issue in *Prairie Band I* and held that the *Bracker* balancing test applies in this case. 253 F.3d at 1255. We stated "that pre-

emption in the context of federal Indian law is about the careful balancing of tribal, federal, and state interests."[6] *Id.* In so ruling, it would appear that it is the law of this case that the *Bracker* balancing test was appropriately applied by the district court. However, as mentioned above, the law of the case doctrine does not prohibit reexamination of that issue.

The propriety of the district court's application of the balancing test is a critical issue on appeal in light of Defendants' assertion that *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), which was decided by the Supreme Court the same day as *Prairie Band I,* has so "altered the legal landscape [ ] that [our] opinion in *Prairie Band [I]* no longer control[s]." Aplt. Br. at 4. Indeed, if we find Defendants' argument persuasive, it is possible that *Hicks* is sufficiently contra-

dictory authority to require a serious re-evaluation of the applicability of the *Bracker* balancing test.

The thrust of Defendants' argument is that the district court's decision to grant the permanent injunction was done in conscious disregard of *Hicks,* which Defendants assert applies to and controls the instant case. In support of this argument, Defendants assert that we determined incorrectly in *Prairie Band I* "that a tribe may exercise its regulatory jurisdiction off reservation and oust the state from its Constitutionally guaranteed right as sovereign to make its own laws and be ruled by them on State land." Aplt. Br. at 11. *Prairie Band I* did not so hold. Instead, as stated above, we addressed "whether defendants' actions interfere with plaintiff's sovereignty or ability to self-govern

**6.** In *Prairie Band I* we stated:

> We disagree with the Ninth Circuit's conclusion that, under *Mescalero,* no balancing of interests takes place once the tribal activity takes place off-reservation. *See Cabazon Band of Mission Indians v. Smith,* 249 F.3d 1101, 1106 (9th Cir.2001) [hereinafter *Cabazon II* ] (*"White Mountain's* preemption analysis is not applicable to off-reservation activity."). Rather, we believe that the dissent in *Cabazon II* had the better of it. *See id.* at 1112 (Browning, J., dissenting) (noting that the *Mescalero* principle "was only a generality and not carved in stone on Mt. Sinai"; also noting that the Supreme Court has not restricted the balancing-of-interests test to cases in which the tribal activity is solely on-reservation). That is, we read *Mescalero* to say that, if the tribal activity is off-reservation that fact *generally* tips the balancing test in favor of the state (assuming there is no express federal law to the contrary).

253 F.3d at 1255 n. 9.

> Recently, in *Cabazon Band of Mission Indians v. Smith,* 388 F.3d 691, 698 (9th Cir.2004) (*Cabazon IV*), the Ninth Circuit reaffirmed their position that, because the tribal activity at issue takes place both on and off the reservation, *Bracker* does not apply. In *Cabazon IV,* the court instead applied *Mescalero* to

invalidate California's application of its vehicle code to prohibit tribal police vehicles from displaying emergency light bars off the reservation. *Id.* at 701. Relying on *Mescalero's* statement that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State," the court determined that applying the light bar prohibition to Indian police vehicles was not a "nondiscriminatory application of state law" because other emergency vehicles, including those of bordering states, were not subject to the same prohibition. *Id.* at 698, 701.

> While we do not agree with the Ninth Circuit's complete rejection of *Bracker,* the *Cabazon IV* analysis regarding the discriminatory effect of the State's motor vehicle code is sound. In *Prairie Band I,* we stated that "arguably the application of the state motor vehicle laws was *not* nondiscriminatory." 253 F.3d at 1257 n. 12. Kansas already recognizes tribal plates from other jurisdictions and foreign nations without any record-supported harm. Certainly, the discriminatory effect of Kansas' motor vehicle registration and titling laws as applied to the Tribe strengthens the Tribe's claim that the *Bracker* balancing of interests inquiry favors them.

to the extent that the State's actions must be preempted *by federal law,* when some of defendants' actions may occur off the reservation." Aplt. Am.App., Vol. IV, at 1018 n. 78 (emphasis added).

In *Hicks,* the Supreme Court, in reaching its ultimate holding that a tribal court did not have "jurisdiction to adjudicate the alleged tortious conduct of state wardens executing a search warrant for evidence of an off-reservation crime," concluded "that tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to 'the right to make laws and be ruled by them.' " 533 U.S. at 357, 364, 121 S.Ct. 2304. Defendants have attempted to characterize *Hicks* as making a broad statement that any time a tribal ordinance secondarily affects non-members off the reservation, state law trumps. Defendants rely on the following passage from *Hicks* to support their sweeping conclusion that whenever conduct secondarily affects non-members off the reservation, state law controls:

> When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. *Bracker, supra,* at 144, 100 S.Ct. 2578. When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified by our decision in *Confederated Tribes.* In that case, Indians were selling cigarettes on their reservation to

nonmembers from off reservation, without collecting the state cigarette tax. We held that the State could require the Tribes to collect the tax from nonmembers, and could impose at least 'minimal' burdens on the Indian retailer to aid in enforcing and collecting the tax, 447 U.S., at 151, 100 S.Ct. 2069.

*Hicks,* 533 U.S. at 362, 121 S.Ct. 2304 (internal quotations omitted). However, the issue in *Hicks* was "whether a tribal court may assert jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." *Id.* at 355, 121 S.Ct. 2304.

*Hicks* addressed tribal interference with legitimate state law enforcement activity on reservation. It did not address, or discuss at all, the issue of when a valid tribal ordinance on reservation has a limited secondary effect off the reservation. We do not necessarily disagree with Defendants' statement that the "[*Bracker* ] balancing of interests test [is inapplicable] when the activity sought to be regulated by the State takes place off reservation land." Aplt. Br. at 8. However, the activity at issue in this case, licensing and titling of vehicles, takes place on the reservation. Even though this case implicates the off-reservation activity of driving on Kansas roads when vehicles leave the reservation for various reasons, "we deem it an on-reservation case for purposes of preemption because the essential conduct at issue occurred on the reservation." *In re Blue Lake Forest Prods., Inc.,* 30 F.3d 1138, 1141 (9th Cir.1994).[7]

---

**7.** In *Prairie Band I* we stated that

the tribal activity in *Mescalero*—the operation of a ski resort located outside reservation land—was conducted clearly and exclusively beyond the reservation, thus heightening the interests of the state. The

same, however, cannot be said of the activity in the instant case: Here, the activity conducted by the tribe was the registration and titling of vehicles; this activity occurred within the reservation, not beyond,

The entire *Hicks'* opinion falls under the umbrella of "Indian tribes' regulatory authority over nonmembers," 533 U.S. at 358, 121 S.Ct. 2304, whereas our case involves federal preemption of a state's exercise of its regulatory power. To be sure, one could argue that these issues are two sides of the same coin. However, Supreme Court and Tenth Circuit precedent make it clear that the two sides of this coin require analysis under different legal frameworks. In cases where an Indian tribe is attempting to assert its authority over non-members, courts are required to apply *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and its progeny. *Hicks* falls squarely within the principles developed by the *Montana* line of cases. *Hicks,* 533 U.S. at 358, 121 S.Ct. 2304. In cases which concern tribal authority over its own members, courts are required to apply the principles articulated in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), and its progeny. This is true even when non-members are secondarily affected. *Prairie Band I,* 253 F.3d at 1256 n. 11. In these cases, when state interests are secondarily affected, *Bracker* must be applied to ascertain and balance all parties' interests. *Id.* at 1255, n. 9

As we noted in *Prairie Band I,* the issues presented in this case require the interpretation and application of the principles articulated by *Mescalero,* not application of *Montana*—which the Supreme Court focused on in rendering its decision in *Hicks.* Since we hold that *Hicks* does not change the application of the *Bracker* balancing test in this case, we must next address whether the district court abused

its discretion in balancing the interests of the parties.

■ The balancing test is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Bracker,* 448 U.S. at 145, 100 S.Ct. 2578. Motor vehicle titling and registration is a traditional government function. *Prairie Band I,* 253 F.3d at 1250; *see also Queets Band of Indians v. Washington,* 765 F.2d 1399, 1403 (9th Cir.1985) ("Indian tribes possess the sovereign authority to license and register tribal vehicles."), *vacated as moot,* 783 F.2d 154 (1986).[8] Because vehicle registration involves a traditional government function, tribal issues are heightened. The Tribe has a significant interest in regulating motor vehicles on its reservation through the comprehensive PBMVC and through the issuance of tribal registrations and titles.

The PBMVC is a comprehensive code which applies to all vehicles that are driven on the reservation. The stated purposes of the PBMVC are:

1) tribal control and regulation of motor vehicle traffic on the reservation, 2) orderly registration and licensing of vehicles owned by tribal members and located on roads and highways within the reservation, 3) assisting law enforcement officers in identifying owners of the vehicles, 4) prevention of fraudulent transfers, theft, and conversion, 5) providing

---

although as an ancillary consequence driving outside the reservation did occur. *Prairie Band I,* 253 F.3d at 1255.

8. The *Ninth Circuit's decision was withdrawn at the request of the parties in anticipation of legislation that would render the controversy moot. However, the reasoning remains persuasive.*

revenue to the Nation through taxation and fees, and [6)] allowing for the orderly transfer of title and other transactions involving vehicles.

Aplt. Am.App., Vol. IV, at 1024 (District Court Opinion, August 6, 2003); Aple. Supp.App., Vol. I, at 55–56 (PBMVC Ch. 17–10–1). If Defendants continue to enforce State motor vehicle registration and titling laws to the exclusion of tribal motor vehicle registration and titling, the Tribe's "motor vehicle code will be effectively defunct." Aplt. Am.App., Vol. IV, at 1026 (District Court Opinion August 6, 2003); *Prairie Band I*, 253 F.3d at 1251; *see also Red Lake Band of Chippewa Indians v. State*, 311 Minn. 241, 248 N.W.2d 722, 727–28 (1976); *Queets*, 765 F.2d at 1409.

The Tribe's interests in this case are linked with strong federal interests in promoting strong tribal economic development, self-sufficiency, and self-governance. "[W]hile there is no federal legislation addressing tribal vehicle registrations and titling, there is an obvious federal interest in the [Tribe]'s right to self-government." Aplt. Am.App., Vol. IV, at 1022 (District Court Opinion, August 6, 2003). These federal goals stem from various Acts of Congress, Executive Branch policies, and judicial opinions. *See generally* Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, § 2704(4) (2000); Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (2000); Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. § 450f (2000); *see also* Presidential Proclamation 7500, 66 Fed. Reg. 57641 (Nov. 12, 2001) ("We will protect and honor tribal sovereignty and help to stimulate economic development in reservation communities."); Exec. Order 13175, 65 Fed.Reg. 67249 (Nov. 6, 2000) ("[We] recognize[ ] the right of Indian tribes to self-government and support[ ] tribal sovereignty and self-determination."); *Bracker*, 448 U.S. at 143, 100 S.Ct.

2578 (there is "a firm federal policy of promoting tribal self-sufficiency and economic development"); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155, 100 S.Ct. 2069, 65 L.Ed.2d 10 (noting that there are "varying degrees [of] congressional concern with fostering tribal self-government and economic development").

Against these strong tribal and federal interests, the sole interest asserted by Defendants is that of public safety. Oral Arg. Transcript, September 29, 2004 (Defendants conceded at oral argument that "[t]here's no issues of revenue in this instance" and that the sole interest was that of safety and protection of a state's police powers.). For purposes of this appeal, it is accepted that tribally titled and registered vehicles will have to leave the reservation and travel on Kansas highways. However, Kansas' sovereignty and public safety interests do not automatically trump the Tribe's interest in self-governance. We already considered and addressed Defendants' asserted safety concerns in *Prairie Band I* and determined that those safety concerns were likely exaggerated. 253 F.3d at 1251–52. The district court further addressed Defendants' safety concerns and determined that "the balance tips in favor of the [Tribe]." Aplt. Am. App., Vol. IV, at 1031 (District Court Opinion, August 6, 2003). We further note that Kansas recognizes license plates from other states, Canada, and Mexico, and tribally issued tags from other jurisdictions, including Minnesota and Oklahoma, without any record-supported safety concerns.

"The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on

the other." *Colville,* 447 U.S. at 156, 100 S.Ct. 2069 (1980) (citation omitted). While off-reservation activity might *"generally* tip[ ] the balancing test in favor of the state," *Prairie Band I,* 253 F.3d at 1255 n. 9, the off-reservation ancillary effects of tribal registration and titling carry no such weight. Without a more concrete and un-inflated interest than the unsupported safety concerns in the record, we cannot hold that the State's interests in regulating the registration and titling of all vehicles driven on Kansas highways overcomes the strong tribal interest in self-governance through tribal registration and titling.

Balancing the federal and tribal interests against the State's interests in this case, we cannot say that the district court abused its discretion granting a permanent injunction. The district court, following our outline in *Prairie Band I,* provided a thorough discussion of the federal, tribal, and state interests in this case. "[I]f the State does not recognize tribal registrations and titles, there will be no tribal registrations and titles and the [Tribe] will be unable to effectively pursue the goal of self-government." Aplt. Am.App., Vol. IV, at 1031 (District Court Opinion, August 6, 2003). Balanced against the amorphous and unsupported safety concerns asserted by the State, the Tribe's interest in self-governance by enacting and enforcing its own vehicle registration and titling laws must prevail.

The concurring opinion invites us to abandon the *Bracker* balancing analysis and align ourselves with the reasoning of the Ninth Circuit in *Cabazon Band of Mission Indians v. Smith,* 388 F.3d 691 (9th Cir.2004) *(Cabazon IV)* (applying *Mescalero* discrimination analysis instead of *Bracker*). In rejecting the balancing approach, the concurrence makes much of the "incommensurate interests" at stake in this case stating that "[i]t reminds me of

asking whether a stick is longer than a rock is heavy." *Id.* This analogy misses the point. What we are doing here is not assessing the stick's length versus the rock's weight, but their value as weapons.

We are doing what we routinely do as judges—assessing normative values to varying interests and weighing one against the other. In applying a balancing test, we have to weigh in context. We measure the normative social values which we assign and reconcile them against one another. For an example, we look to the numerous exceptions we have created to the Fourth Amendment. We assign a value to a police officer's safety, and we assign a value to the Fourth Amendment protections of the party who is the subject of a search. These are as unlike each other as rocks and sticks, but still we weigh them against each other. Another example is in the context of trial court error. In our review, we weigh the error against the value of another body of evidence. In so doing, we often conclude that the error is harmless. We even make such distinctions as harmless beyond a reasonable doubt. This challenge is the essence of judicial function. A unique challenge certainly does not divest us of our responsibility to consider and reconcile competing interests to determine which is of greater importance.

We agree with the concurring opinion that "the argument is really about revenue." *See id.* The balance can be characterized as one of revenue and control. The concurrence's discrimination discussion effectively proves that the State's claim of safety is a pretense and that, to them, this case is all about money. The Tribe has less resources than the State. It subsists on the land where it was forced to go by the Government. On its reservation, the Tribe is using its own resources to effectively self-govern and maintain its viability.

Tribal registration is one such available way to do so. The State apparently resents that it has lost some amount of control over the Tribe—and that it has lost some revenue.

We do not disagree with the concurrence's discrimination analysis. However, while "discrimination" may very well be an additional appropriate analysis in the instant case, it was not tried on that ground. Additionally, neither party briefed or argued the discrimination issue or provided any reason (other than *Nevada v. Hicks*) to abandon the sound *Prairie Band I* reasoning. More importantly, the theory on which the case was tried is fully supported by the cases. The *Bracker* analysis is more in line with the Congressional mandate to encourage tribal self-government and economic development. We take this mandate seriously and prefer to ground our analysis in the line of reasoning which more effectively strengthens tribal interests.

It is worth noting that the concurring opinion incorrectly states that we believe that we are "bound, under principles of law of the case, by the analysis in [*Prairie Band I*]." *See id.* at 1029. Our discussion of law of the case correctly relates the principles of the doctrine. *See* Op. at 1018–19. Indeed, we specifically recognized that the principles of law of the case are flexible and that we "are permitted to overturn erroneous rulings as the underlying policy

of the rule is one of efficiency … not restraint of judicial power." See Op. at 1018 (internal citations omitted). However, while it is true that we are not *bound* by *Prairie Band I*, it is not true that "the law of the case doctrine does not apply" merely because *Prairie Band I* dealt with a preliminary injunction. *See* Concurring Op. at 1017. The procedural posture of *Prairie Band I* does not undermine the thorough and sound discussion of *Bracker* contained within.

▪ The next issue is whether the district court erred in its ruling that Defendants were not entitled to sovereign immunity. The Eleventh Amendment grants states sovereign immunity from suits brought in federal court by its own citizens and citizens of other states, suits by other sovereigns, and suits by an Indian tribe.[9] *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779–80, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). Defendants argue that the district court's issuance of a permanent injunction against them violates the Eleventh Amendment of the United States Constitution because the Tribe is effectively suing the state.

The Supreme Court carved out an exception to state sovereign immunity in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),

> based in part on the premise that sovereign immunity bars relief against States and their officers in both state and fed-

---

**9.** The Eleventh Amendment provides as follows:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Despite the narrowness of its terms, since *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), we have understood the Eleventh Amendment to stand not so much for what

it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty; and that a State will therefore not be subject to suit in federal court unless it has consented to suit, either expressly or in the "plan of the convention."

*Blatchford*, 501 U.S. at 779, 111 S.Ct. 2578 (internal citations omitted).

eral courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.

*Alden v. Maine,* 527 U.S. 706, 747–48, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Defendants recognize this well-established exception which permits suits for prospective injunctive relief against state officials acting in violation of federal law. State officers sued in *Ex parte Young* cases must have "some connection" to the enforcement of the allegedly defective act. Defendants argue that because they are not specifically empowered to enforce the state statute in question, they do not have a sufficient connection with the act that the Tribe is effectively suing the State.

■ Defendants are not required to have a "special connection" to the unconstitutional act or conduct. Rather, state officials must have a particular duty to "enforce" the statute in question and a demonstrated willingness to exercise that duty, *Ex parte Young,* 209 U.S. at 157, 28 S.Ct. 441, which Defendants have stipulated to in this case. Aplt. Am.App., Vol. I, at 171. "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact. . . ." *Ex parte Young,* 209 U.S. at 157, 28 S.Ct. 441.

Defendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect[10] to the law. Defendant Walker, as Director of Vehicles, manages vehicle registrations and titles and supervises vehicle reciproci-

ty; Defendant Wagnon, as the Secretary of Revenue, is the State official—in connection with Defendant Walker—who decided to deny the validity of the Tribe's registrations; and Defendant Seck, as Superintendent of the Kansas Highway Patrol, enforces traffic and other laws of the State related to highways, vehicles, and drivers of vehicles. This satisfies the "some connection" requirement of *Ex parte Young.*

We agree with the district court that Defendants' assertion that because Defendants cannot change state law to remedy the Tribe's concerns—but can only enforce the law as written—they are not proper parties rests on faulty reasoning.[11] "[T]he essence of an *Ex parte Young* action is seeking relief against the state officials who are responsible for enforcing the violative state laws, not against the state officials who drafted the violative legislation." Aplt. Am.App., Vol. IV, at 1014 (District Court Opinion, August 6, 2003).

■ The final issue is whether the district court erred in ruling that the relief requested by the Tribe does not violate the Tenth Amendment of the United States Constitution. Defendants claim the injunction requested by the Tribe violates the Tenth Amendment pursuant to *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), because it is effectively a mandate by Congress to recognize the Tribe's motor vehicle licenses and titles.

---

**10.** "To give effect" is the definition of "enforce." Webster's Third New International Dictionary 751 (1986).

**11.** We are similarly unimpressed with Defendants' circular argument that section 8–138a is "unenforceable" because the statute does not contain any specific language stating how it is to be enforced. *See* Aplt. Br. at 53–56. Obviously, section 8–138a has been enforced through section 8–142 in that three citations have been issued to tribally tagged motor vehicles.

*New York*[12] and *Printz*[13] stand for the proposition that Congress cannot force states to enact or enforce federal regulatory programs. However, as articulated by the district court,

> *Printz* and *New York* are easily distinguishable from the facts at hand, for here the government is not attempting to compel the state to enact or enforce a federal program. Rather, plaintiff is merely asking the Court to enjoin the defendants from enforcing a *state* law that allegedly infringes on rights guaranteed to plaintiff by federal law.

Aplt. Am.App., Vol. IV, at 1016 (District Court Opinion August 6, 2003). "[T]his is a case about state law infringing on rights guaranteed by federal law, and there is no question that federal courts have the power to order state officials to comply with federal law." *Mille Lacs Band of Chippewa Indians v. State of Minnesota,* 124 F.3d 904, 928 n. 44 (8th Cir.1997), *aff'd* 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). The permanent injunction requested by the Tribe does not mandate state participation in the enforcement of a federal statutory scheme; and, therefore, the Tenth Amendment has not been violated.

**AFFIRMED.**

McCONNELL, Circuit Judge, concurring.

We are asked to decide whether the State of Kansas may require members of a Kansas Indian tribe to register and title their vehicles with the State if they drive off-reservation on Kansas roads and highways. The majority decides this question by engaging in a balancing test pursuant to *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). It balances the Prairie Band's sovereignty interests and related interests in "strong tribal economic development, self-sufficiency, and self-governance" against the State of Kansas's interest in "public safety." Op. at 1023–24. I am not sure what to think of this balance between incommensurate interests. It reminds me of asking whether a stick is longer than a rock is heavy. *Cf. Bendix Autolite Corp. v. Midwesco Enterprises, Inc.,* 486 U.S. 888, 897, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (Scalia, J., concurring). I confess I suspect the argument is really about revenue, which both sides deny.

Fortunately, no such balancing is required. Because the issue here is the regulatory authority of the State over activity by tribal members *outside the reservation,* the proper analysis is not the balancing test of *Bracker,* which applies to attempts by state governments to regulate or enforce laws on Indian reservations, but that set forth in *Mescalero Apache Tribe v. Jones:* "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *see also Nevada v. Hicks,* 533 U.S. 353, 362, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (restating these principles in the criminal context).

The majority applies the *Bracker* balancing test on the ground that "the activity

---

**12.** In *New York,* the Supreme Court held that a provision of the Low–Level Radioactive Waste Policy Act which required states to accept ownership of waste or regulate according to Congressional instructions was inconsistent with the Tenth Amendment. 505 U.S. at 175–77, 112 S.Ct. 2408.

**13.** In *Printz,* the Court struck down a portion of the Brady Act which required state officers to implement a federal regulatory program as violative of the Tenth Amendment. 521 U.S. at 933, 117 S.Ct. 2365 ("The Federal Government may not compel the States to enact or administer a federal regulatory program.").

at issue in this case, licensing and titling of vehicles, takes place on the reservation." Op. at 1022. I cannot agree. The State of Kansas has not attempted to project its jurisdiction over the on-reservation activities of the tribal vehicle registration and titling office. As the majority notes, "No one disputes the Tribe's authority to apply the [Prairie Band Motor Vehicle Code] on reservation land...." Op. at 1020. The sole issue in the case is whether, when tribal members drive their vehicles off reservation onto Kansas roads, this can be regulated by the State.

If a tribe purported to issue "indulgences" allowing motorists to exceed the speed limit on Kansas highways, and an indulgence holder claimed that it preempted the Kansas traffic laws, no one would say the activity at issue is that of the tribal office of indulgence-granting. It is speeding on Kansas roads. For the same reason, it seems beyond question that this case is about the authority of the State over "Indians going beyond reservation boundaries," and not about an attempt by the State to regulate activities taking place within the quasi-sovereign reservation lands of the Prairie Band. *Mescalero,* 411 U.S. at 148, 93 S.Ct. 1267.

The majority adopts this approach in the apparent belief that this panel is bound, under principles of law of the case, by the analysis in *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234 (2001) (*Prairie Band I* ).[1] *See* Op. at 1020 ("[W]e squarely addressed this issue in *Prairie Band I* and held that the *Bracker* balanc-

ing test applies in this case."); *see also id.* at 1018 (describing the argument as resting on "the law of the case doctrine"). In *Prairie Band I,* we affirmed the district court's grant of a preliminary injunction against Kansas's enforcement of its vehicle registration and titling requirements against vehicles registered and titled by the Prairie Band.

*Prairie Band I* was not a decision on the merits; it held only that the plaintiff's argument raised "questions going to the merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Prairie Band I,* 253 F.3d. at 1257 (quoting *Federal Lands Legal Consortium v. United States,* 195 F.3d 1190, 1195 (10th Cir.1999)) (ellipsis in original). That was all it took to justify the preliminary injunction. *Prairie Band I* did not, as the majority contends, hold "that the *Bracker* balancing test applies in this case." Op. at 1020. Three times— once before, once after, and once in the middle of its discussion of the likelihood of success on the merits—the *Prairie Band I* opinion stressed that the tribe only had to prove, and thus the Court only had to decide, the more limited question of whether there were serious, substantial, difficult, and doubtful questions going to the merits. *Prairie Band I,* 253 F.3d. at 1253, 1255, 1257. That was in keeping with the Supreme Court's admonition that it is improper to "equate[ ] 'likelihood of success' with 'success' " in the context of a preliminary injunction ruling. *University*

---

**1.** As an additional reason to adhere to the *Bracker* analysis, the majority states that "neither party briefed or argued the discrimination issue or provided any reason (other than *Nevada v. Hicks* ) to abandon the sound *Prairie Band I* reasoning." Op. at 1026. To the contrary, appellants strenuously argued in this Court that the *Mescalero* discrimination test, rather than *Bracker* balancing test, ap-

plies to this case. Br. of Appellants, at 28–31; see also Br. of Appellees, at 24–30 (responding to the argument). To be sure, the appellants failed to offer a persuasive argument why they should *prevail* under the *Mescalero* test. As their opponents pointedly observed: "they utterly fail to account for [*Mescalero's* ] indication that state laws cannot discriminate against Indians off-reservation." *Id.* at 43.

*of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* at 395, 101 S.Ct. 1830. It follows that law of the case doctrine does not apply, and this panel is not bound.

Contrary to Kansas's arguments, however, application of *Mescalero* does not result in victory for the State. The *Mescalero* standard provides that tribal members are subject to non-discriminatory state laws when they are not on reservation lands. *Mescalero,* 411 U.S. at 148–49, 93 S.Ct. 1267. The question, then, is whether Kansas's registration and titling policy is non-discriminatory.

Kansas law broadly permits residents of other jurisdictions to drive their vehicles on Kansas roads if their vehicles are "duly licensed" in their own "state of residence," provided that the driver's jurisdiction permits vehicles registered in Kansas to drive on *its* roads. *See* Kan. Stat. Ann. § 8–138a. For purposes of this reciprocity statute, " 'state' means a state, territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a foreign country and a state or province of a foreign country." Kan. Stat. Ann. § 74–4305. Thus, residents of Missouri, Newfoundland, or Singapore can drive on Kansas roads without being forced to register their cars in Kansas, provided each jurisdiction extends equal hospitality to Kansas drivers. Indeed, Kansas even recognizes vehicles licensed by Indian tribes from outside of Kansas. In *State v. Wakole,* 265 Kan. 53, 959 P.2d 882, 883 (1998), the Kansas Supreme Court

determined that tribally registered vehicles from Oklahoma were "duly licensed in the state of residence" because Oklahoma recognized the tribal registrations.

It is undisputed in this case that the Prairie Band permits Kansas residents to drive on the reservation in vehicles registered and titled in Kansas. It thus appears that out of the universe of non-Kansas vehicles that appear on Kansas highways, the State recognizes and is willing to accept registration and titling by the driver's jurisdiction of residence, subject only to a requirement of reciprocity, except in the case of Kansas-based Indian tribes. That is a form of discrimination.

The State argues that public safety concerns justify this differential treatment, focusing particularly on the failure of the Prairie Band to include its vehicle registrations in the national criminal database. *See Prairie Band I,* 253 F.3d at 1251. As this Court acknowledged at the preliminary injunction stage, that is a "legitimate concern." *Id.* But it raises the question: Does Kansas refuse to recognize registrations from other jurisdictions that, like the Prairie Band, are not linked to the national criminal database? If nonparticipation in the database is a genuine problem, Kansas could amend its reciprocity statute to recognize only those non-resident registrations that are included in the database, or meet other non-discriminatory public safety criteria. That would present a different case. Under the present statute, however, Kansas appears to be imposing on residents of Kansas-based reservations a requirement that it does not impose on residents of any other jurisdiction.[2]

---

2. A similar discrimination analysis might apply to any interest it may have in generating revenue by requiring members of Kansas tribes to register their vehicles with the State—an interest hinted at by the State's brief in this Court. See Br. of Appellants, at

25. According to the brief, Kansas exempts tribal members from paying personal property tax on their vehicles, but imposes a flat fee "tailored ... to the amount of actual off-reservation use." *Id.* Kansas does not charge such a fee to other non-resident drivers.

This analysis comports with the Ninth Circuit's approach in *Cabazon Band of Mission Indians v. Smith,* 388 F.3d 691 (9th Cir.2004). That case addressed whether California's refusal to permit tribal law enforcement vehicles to display emergency light bars was a discriminatory application of state law because California permits law enforcement vehicles from bordering states to display and operate emergency light bars within fifty miles of the border. *Id.* at 698–99. The court determined that tribal law enforcement agencies are similarly situated to the law enforcement agencies of bordering states. *Id.* at 699–700. Because there was no discernible reason for exempting law enforcement vehicles from bordering states from the emergency light bar rules, but not tribal enforcement vehicles, the court held that California was applying state law in a discriminatory manner. *Id.* at 700–01.

In this case, Prairie Band vehicles are similarly situated to vehicles licensed in jurisdictions outside of Kansas. Kansas recognizes these foreign vehicles without reference to any safety standards. By invoking a safety rationale for refusing to recognize Prairie Band vehicles, Kansas treats similarly situated parties differently. This is a discriminatory application of state law that violates the *Mescalero* standard. It is for this reason that the tribe should prevail. It is no disparagement of Congress's undoubted "mandate to encourage tribal self-government and economic development" (Op. at 1026), to recognize that in this case the tribe should prevail not on the basis of a balancing test designed for state regulation of on-reservation activities, but rather on the basis of the discrimination test applicable to state regulation

of the off-reservation conduct of tribal members. I respectfully concur.

---

However, counsel for the State appeared to waive any consideration of the interest of the state in revenue generation from vehicle licensing, so a detailed analysis of this argument is not necessary. Oral Arg. Transcript, Sept. 29, 2004.